IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 DEC 29  AM 10: 04

U.S. ... ... COURT
N.D. OF ALABAMA

CAR WASH HEADQUARTERS OF        }
ALABAMA, L.L.C.,                }
                                }
          Plaintiff,            }
                                }          CASE NO. CV 02-JEO-365-S
v.                              }
                                }
STANDARD 3 IN 1 CAR WASH        }
SYSTEMS, INC., et al.,          }
                                }
          Defendants.           }

# ENTERED

DEC 29 2003

## MEMORANDUM OPINION

Before the court is the plaintiff's Motion for Summary Judgment.[1] (Doc. 18).[2] Also

before the court is the defendants' Motion for Summary Judgment. (Doc. 20). For the reasons

set forth below, the court finds that both motions for summary judgment are due to be granted in

part and denied in part.

## FACTUAL BACKGROUND[3]

On May 13, 1999, plaintiff Car Wash Headquarters of Alabama, L.L.C. (the "plaintiff"),

and defendant Standard 3 in 1 Car Wash Systems, Inc. ("Standard"), entered into an Agreement

---

[1]The court notes that the plaintiff has dismissed its claims against Leigh H. Allison, so
she is no longer a defendant in the case. (Doc. 20 at 1, n.1).

[2]References to "Doc. __" are to the documents as numbered by the clerk of court in the
court's record of the case.

[3]The facts set out below are gleaned from the parties' submissions and they are viewed in
a light most favorable to the non-moving party. They are the "facts for summary judgment
purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel &
Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) " *Underwood v. Life Insurance Co. of Georgia*,
14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

30

of Purchase and Sale (the "Agreement") of a car wash facility called "Rain Tunnel Car Wash,

611 Montgomery Highway, Birmingham, Alabama 35216 (the "Facility"). (Doc. 18 at Ex. B).

The Facility includes a car wash building, gas tanks, gas pumps and three underground storage

tanks which hold gasoline. (Allison depo. at 30-31).[4]  Standard was listed as the owner of the

storage tanks on the Notification of Underground Storage Tanks made to ADEM. (Doc. 18 at

Ex. E).

The Agreement contained certain warranties and representations that were set forth in

Attachment IV to the Agreement. The Agreement states as follows:

> 10.    Warranties and Representations by Seller.[5]  In addition to the conditions
> set forth elsewhere herein, Seller and Jack Allison, as the Seller's sole
> shareholder ("Allison"), jointly and severally represent and warrant to
> Purchaser[6] that the matters described on Attachment IV are true and correct as
> of the date hereof and shall be true and correct as of the date of the Closing,
> which representations and warranties shall, as to Seller, survive the Closing for a
> period of twenty-four (24) months, unless otherwise expressly provided herein,
> and as to Allison, shall survive Closing for a period of (i) twelve (12) months
> after Closing if such breach of representation or warranty by Allison is not a
> knowing breach of warranty or misrepresentation, or (ii) twenty-four (24) months
> after Closing as to any knowing breach of warranty or misrepresentation by
> Allison, subject, however, to the provisions of Paragraph 13 of Attachment IV
> hereto. Seller and Allison acknowledge that Purchaser has relied and will rely on
> such representations and warranties in executing this Agreement and in closing
> the purchase of the Property pursuant to this Agreement, and Seller and Allison
> agree during the term of this Agreement to promptly notify Purchaser in writing
> of any material change affecting such representations and warranties.

---

[4]The deposition of defendant Jack Allison ("Allison") is located in the record at doc. 18, Ex. C. Excerpts of the Allison deposition, as well as exhibits referred to therein, are located in the record at doc. 20, Ex. A.

[5]Standard is the "Seller" under the Agreement.

[6]Plaintiff is the "Purchaser" under the Agreement.

2

(Doc. 18 at Ex. B, ¶ 10).  Attachment IV to the Agreement, which is titled "Warranties and

Representations," states as follows:

> Seller and Allison jointly and severally represent and warrant to Purchaser that the following matters are true and correct as of the date hereof and shall be true and correct as of the date of Closing, which representations and warranties shall survive the Closing for the period stated in Section 10 of the Agreement except as expressly provided otherwise below:

> \* \* \*

> 13.  Environmental Matters.  The Land is in compliance in all material respects with the following (herein collectively called the "Environmental Laws"): the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901, et seq., as amended, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Reauthorization Act of 1986 ("CERCLA"), 42 U.S.C. § 9601, et seq., and any other federal, state or local statute, law ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any substance that is (collectively, "Hazardous Substances") deemed or considered hazardous to human health, wildlife or the environment; gives rise to any clean-up, remediation or removal and disposal obligations on the part of the owner or operator of the property affected thereby, or any party discharging or disposing of same; or gives rise to liability in trespass on any other legal basis should the material in question migrate onto, under or within any adjacent or nearby property, including, without limitation, petroleum products and substances, asbestos and "asbestos-containing materials" and polychlorinated biphenyls (PCBs).  There are no liens on or affecting the Property created, permitted or imposed by any Environmental Laws and there is no actual, asserted or threatened liability or obligation of the Seller, related to the Property, under any Environmental Laws.  Further, (i) except for liquid hydrocarbon contamination occurring approximately ten (10) years ago (which contamination was completely and properly remediated by Seller in accordance with applicable environmental laws), no Hazardous Substance, including, without limitation, asbestos and the group or organic compounds known as polychlorinated biphenyls, has been generated, treated, stored, or disposed of, or otherwise deposited in or located on, or released on or to the Property, including, without limitation, the surface and subsurface waters of the Property, except that Seller has stored and used on the Property gasoline, automotive oil, car wash cleaning detergents, waxes and supplies, but has handled, stored, used and disposed of same (off the premises of the Property) in compliance with all applicable laws and regulations, (ii) no party has engaged in any activity on the

3

Property which would cause (A) the Property to be a hazardous waste treatment, storage or disposal facility within the meaning of or otherwise bring such Property within the ambit of the RCRA, as amended, or any similar state law or local ordinance or other environmental law, or (B) the discharge of pollutants or effluents into any water source or system, or the discharge into the air of any emissions, which would require a permit under the Federal Water Pollution Act, 33 U.S.C. § 1251, et seq., or the Clean Air Act, 42 U.S.C. § 7401 et seq., or any similar state law or local ordinance or any other environmental law, and (iii) no underground storage tank is located on or under the Property except for the underground gasoline storage tanks connected to the existing above-ground retail gasoline dispensing facilities on the Property, which underground gasoline storage and dispensing facilities Seller represents: (a) are in compliance with all current standards and specifications for newly installed underground gasoline storage tanks under applicable law, (b) have been tested for tank tightness and not found to be leaking, and (c) have not, except as set forth above, resulted in overspill or overfill contamination of the Property with petroleum products.  As used in the Agreement, the term "release" shall have the meaning specified in CERCLA and "Solid Waste" and "disposal" (or "disposed") shall have the meanings specified in RCRA; provided, however, to the extent that the laws of the State of Alabama establish a meaning for such terms which is broader than that specified in this paragraph 13, such broader meaning shall apply.  Seller agrees to indemnify, defend and hold harmless Purchaser from and against any and all claims, liabilities, actions, suits, fines, proceedings, enforcement actions, investigation costs, clean-up actions, damages, losses and expenses, including, without limitation, court costs and reasonable attorney's fees, resulting from any use or operation of the underground storage tanks or handling of Hazardous Substances of any kind on (or disposal from) the Property prior to Closing, whether or not Seller knew or did not know of such contamination as of the Effective Date or prior to Closing.  Notwithstanding anything to the contrary contained in this Agreement, this indemnity obligation of Seller shall survive Closing and shall not be limited to the twenty-four (24) month limitation on the representations and warranties set forth in this Agreement.

Notwithstanding anything elsewhere in this Agreement, Seller's and Allison's representations and warranties set forth in this paragraph 13 shall survive Closing for the longer of (i) twenty-four months after Closing, or (ii) any applicable statute of limitations period.

(Doc. 18 at Ex. B, Attachment IV).  The Agreement also contains the following language:

15.   Conditions to Closing.  The following shall be conditions precedent to Purchaser's obligations under this Agreement:

4

* * *

>     (c)     Hazardous Substances.  There shall have been no
> Hazardous Substances or Solid Waste discovered to be currently present in,
> under or on the Property, or on any adjacent or nearby property if the
> contamination of the Property is likely or imminent; provided, however, that if
> Purchaser discovered any particular Hazardous Substances or Solid Waste
> contamination during the Study Period and did not elect to terminate this
> Agreement pursuant to Section 4, then Purchaser shall be deemed to have waived
> objection to the particular contamination so discovered by Purchaser.

(Doc. 18, Ex. B at 5).

The Agreement contains several other pertinent provisions.  Paragraph 12 states that,

upon a condition of default, the plaintiff would have the right to:

> [e]nforce specific performance of the obligations of the Seller under this
> Agreement and recover from Seller in such action all of the attorneys' fees and
> costs of court incurred in connection therewith, and any damages proximately
> caused by the delay.

(Doc. 18, Ex. B at 3-4).  Paragraph 27 of the Agreement provides for an award of attorneys' fees

and court costs to the prevailing party in any litigation or proceeding commenced concerning

any provision of the Agreement or the rights and duties of any person or entity in relation

thereto.  (Doc. 18, Ex. B at 7-8).

The Agreement also called for a 45-day study period prior to closing.  (Kaplan depo. at

36).[7]  The study period was extended many times by mutual agreement of the parties to the

Agreement and ultimately lasted almost 14 months because gasoline contamination was

discovered by Dames & Moore, an environmental consultant retained by the plaintiff to perform

an environmental assessment of the Facility during the initial study period.  (Kaplan depo. at

_____

[7]Excerpts of the Kaplan deposition are found in the record at doc. 20, Ex. B.  Additional
excerpts of the Kaplan deposition are found in the record at doc. 18, Ex. N.

36-38, 44).

After Dames & Moore discovered the gasoline contamination, the parties tried to get a "no further action" letter ("NFA letter") from the Alabama Department of Environmental Management ("ADEM"). (Kaplan depo. at 40). In October, 1999, about five months into the study period, ADEM indicated that a NFA letter could not be issued at that time and stated that a secondary investigation should be conducted. (Allison depo. at 44-45, Ex. 6).

Another environmental consultant, Perry Pyron & McCown Consultants, Inc. ("PPM"), was then retained to perform a secondary investigation. (Allison depo. at 61-62). PPM submitted a report dated June 28, 2000, to ADEM concerning its evaluation of the property and recommended that a NFA letter be issued. (Allison depo. at 61-62, Ex. 8 at 10; Kaplan depo. at 48-49). The plaintiff and Standard contributed equally to paying for the secondary investigation report by PPM and both companies received a copy of the report. (Allison depo. at 61-62, Ex. 5 n.6; Kaplan depo. at 48-49).

The sale of the Facility from Standard to the plaintiff was closed on July 18, 2000. (Kaplan depo. at 46). The purchase price at closing was $705,000.00. Leigh Hill Allison, wife of Allison, was paid $330,000.00 at closing for a mortgage she held on the Facility. (Doc. 18 at Ex. H). Standard, as the seller, received approximately $337,850.85 in net sales proceeds. (Doc. 18 at Ex. H).

During the closing, Allison, both individually and as president of Standard, executed a Certificate of Reaffirmation of Representations and Warranties (the "Reaffirmation"). (Allison depo. at 37-38, Ex. 4). The Reaffirmation states, in pertinent part, as follows:

Standard 3 in 1 Car Wash Systems, Inc., an Alabama corporation ("Seller") and

6

Jack Allison ("Allison") on this 18th day of July, 2000, hereby reaffirm and certify to Car Wash Headquarters of Alabama, L.L.C., a Delaware limited liability company ("Purchaser"), that each of the representations and warranties of the Seller and Allison contained in that certain Agreement of Purchase and Sale (the "Agreement"), dated effective as of May 13, 1999, between the Seller and Purchaser, are true and correct in all material respects as of the date hereof.

Accordingly, as of the date hereof, Seller represents and warrants to Purchaser as follows, which representations and warranties shall, as to Seller, survive the Closing for a period of twenty-four (24) months, unless otherwise expressly provided herein, and as to Allison, shall survive Closing for a period of (i) twelve (12) months after Closing if such breach of representation or warranty by Allison is not a knowing breach of warranty or misrepresentation, or (ii) twenty-four (24) months after Closing as to any knowing breach of warranty or misrepresentation by Allison, subject, however, to the provisions of paragraph 13 below. . . .

(Doc. 18, Ex. I at 1).[8]  The Reaffirmation also includes the following indemnification provision:

Seller agrees to indemnify, defend and hold harmless Purchaser from and against any and all claims, liabilities, actions, suits, fines, proceedings, enforcement actions, investigation costs, clean-up actions, damages, losses and expenses, including, without limitation, court costs and reasonable attorney's fees, resulting from any use or operation of the underground storage tanks or handling of Hazardous Substances of any kind on (or disposal from) the Property prior to Closing, whether or not Seller knew or did not know of such contamination as of the Effective Date or prior to Closing.  Notwithstanding anything to the contrary contained herein, this indemnity obligation of Seller shall survive Closing and shall not be limited to the twenty-four (24) month limitation on the representations and warranties set forth herein or in the Agreement.

Notwithstanding anything elsewhere herein or in the Agreement, Seller's and

---

[8]Paragraph 13 of the Reaffirmation, titled "Environmental Matters," is similar to paragraph 13 of Attachment IV to the Agreement, quoted above.  The only difference in the two passages is that the sentence in paragraph 13 of Attachment IV to the Agreement which begins "[f]urther, (i) except for liquid hydrocarbon contamination occurring approximately ten (10) years ago (which contamination was completely and properly remediated by Seller in accordance with applicable environmental laws), no Hazardous Substance. . ." was replaced in the Reaffirmation with the following: "Further, (i) except for liquid hydrocarbon contamination occurring approximately 10 years ago, and as disclosed on the Secondary Investigation Evaluation Report dated June 28, 2000, no Hazardous Substance. . . ." (Allison depo. at Ex. 4, p. 3).

> Allison's representations and warranties set forth in this paragraph 13 shall
> survive Closing for the longer of (i) twenty-four months after Closing, or (ii) any
> applicable statute of limitations period.

(Doc. 18, Ex. 1 at ¶ 13).

Before the closing, Standard and Allison represented to the plaintiff on several occasions

that they would be able to get an NFA letter from ADEM with respect to the Facility.  (Kaplan

Aff. at ¶ 11).[9]  But despite the failure to procure a NFA letter with respect to the Facility, the

plaintiff purchased the Facility, allegedly relying on representations and contractual

commitments by Standard and Allison that they would indemnify the plaintiff for costs and

expenses it incurred with respect to remediation efforts.  (Kaplan Aff. at ¶ 12).

Just ten days after the closing, on July 28, 2000, ADEM sent a letter to Allison in which

it responded to PPM's Secondary Investigation report and did not mention PPM's suggestion

therein that it issue a NFA letter.  (Doc. 18 at Ex. L).  Instead, it ordered as follows:

> [ADEM] has determined that a plan for interim remedial methods should be
> developed to address the contaminated perched tank water at this site.  Interim
> remedial methods may entail passive remediation methods such as periodic
> groundwater monitoring or more aggressive techniques such as vacuum
> extraction.

(Doc. 18 at Ex. L).

PPM sent a memorandum dated July 24, 2000, to counsel for Standard, stating that

ADEM refused to grant a NFA letter with respect to the Facility due to the hydrocarbon

concentrations in the tank pit and listing options for dealing with the problem.  (Doc. 18 at Ex.

M).  Neither Allison nor Standard have taken any of the listed actions for dealing with the

contamination since the Facility was sold to the plaintiff.  (Allison depo. at 69-70).

---

[9]The Kaplan affidavit is located in the record at doc. 18, Ex. A.

8

The plaintiff has implemented a groundwater monitoring plan in response to the contamination, which plan was approved by ADEM. (Kaplan Aff. at ¶ 13, Ex. 1). The plaintiff's president, Joseph William Kaplan ("Kaplan"), testified that this plan is "a passive and necessarily long-term remediation plan that, in fact, could last indefinitely. To date, although ADEM has for the time being accepted [the plaintiff's] semi-annual groundwater monitoring plan, ADEM has given no indication that it will issue a NFA in the future or allow continued passive remediation." (Kaplan Aff. at ¶ 13). Kaplan also testified that "Defendants have failed and refused to pay for the monitoring or the eventual remediation or to provide any assurances, financial or otherwise, that they will help or assist with monitoring efforts in the future." (Kaplan Aff. at ¶ 13). Kaplan also stated as follows:

> Since [the plaintiff] has been given no indication that semi-annual groundwater monitoring will result in the issuance of a NFA, and since Defendants have failed to assist in such efforts or provide assurances that they will assist in such efforts in the future, Car Wash HQ has also taken steps to investigate the use of a chemical oxidation process to clean up the contamination at the Facility. Chemical oxidation is an active remediation measure intended to actually clean up the contamination at the Facility to "drinking water standards." ADEM requires the Facility to satisfy such standards before they will issue a NFA. [The plaintiff] has hired a consultant, URS Corporation, which has prepared a proposal for site remediation using the chemical oxidation process. A true and accurate copy of URS's report sent to my company is attached as Exhibit "2" hereto. I have provided information to Defendants regarding the chemical oxidation process but they have failed to respond to my correspondence. . . . The most reasonable approach to the contamination at the site which is in the best interests of human health and the environment is to employ this active remediation plan under the present circumstances because (1) this process will actually clean up the contamination, (2) this process will address the problem immediately, and (3) since the Defendants have failed and refused to provide any assurances whatsoever that, in accordance with their legal and contractual duties, they will pay for or assist with the potentially indefinite monitoring efforts, chemical oxidation is the most time and cost efficient method available to ensure that Defendants fulfill their financial obligations to pay for the cleanup.

(Kaplan Aff. at ¶ 14).

Before the closing, ADEM informed Standard and Allison that it was unable to determine whether the Facility qualified for Alabama's Tank Trust Fund Benefits because there were no records for the Facility concerning leak detection for tanks or pressurized piping. (Doc. 18 at Ex. R). ADEM also noted that it needed a missing summary of SIR reports for 1998 with respect to the Facility in order to finalize any such determination. (Doc. 18 at Ex. R). The plaintiff argues that, if Standard and Allison had taken the necessary steps to ensure that the Facility qualified for this trust, the trust's fund would have been available to pay for costs associated with contamination at the Facility.

The plaintiff filed this action on February 12, 2002, alleging that the defendants had violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, and seeking declaratory and injunctive relief relating to the investigation and cleanup of contamination at the Facility. (Doc. 9 at ¶¶ 44-57). The plaintiff also seeks damages under Alabama law for breach of contract, negligence, public nuisance, indemnity, fraudulent misrepresentation, fraudulent suppression, and fraudulent deceit. (Doc. 9 at ¶¶ 58-95). The plaintiff further seeks attorneys' fees under the Agreement and under the enforcement provisions of RCRA, as well as a finding that Rain Tunnel Enterprises, Inc., into which Standard merged, is liable for the contamination as a successor-in-interest corporation. (Doc. 9 at ¶¶ 96-105). The plaintiff also seeks a finding that Standard and Allison fraudulently conveyed certain proceeds of the sale and that they engaged in a conspiracy to shield assets from the plaintiff. (Doc. 9 at ¶¶ 106-15).

10

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### 1.    RCRA Claims

The plaintiff claims that it is entitled to injunctive relief under RCRA against Standard

11

and Allison. RCRA is "a comprehensive environmental statute that governs the treatment,

storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S.

479, 483 (1996) (citing *Chicago v. Environmental Defense Fund*, 511 U.S. 328, 331-32, 114 S.

Ct. 1588, 1589-90, 128 L. Ed. 2d 302 (1994)). RCRA permits "'citizen suits,' in which a

citizen may bring a lawsuit against any 'person' who has contributed, or who is contributing, to

the past or present handling, storage, treatment, transportation, or disposal of any solid or

hazardous waste which may present an imminent and substantial endangerment to health or the

environment." 42 U.S.C. § 6972(a)(1)(B).

Section 6972(a) authorizes district courts "to restrain any person who has contributed or

who is contributing to the past or present handling, storage, treatment, transportation, or

disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to

take such other action as may be necessary, or both. . . ." 42 U.S.C. § 6972(a)(1)(B)(2).

The defendants argue that they are entitled to summary judgment on the RCRA claims

because the plaintiff cannot demonstrate that it complied with the notice requirement of 42

U.S.C. § 6972(b)(2)(A), which states as follows:

> (2)(A) No action may be commenced under subsection (a)(1)(B) of this section
> prior to ninety days after the plaintiff has given notice of the endangerment to –
>
> (i) the Administrator;
>
> (ii) the State in which the alleged endangerment may occur;
>
> (iii) any person alleged to have contributed or to be contributing to the past or
> present handling, storage, treatment, transportation, or disposal of any solid or
> hazardous waste referred to in subsection (a)(1)(b) of this section, *except that
> such action may be brought immediately after such notification in the case of a
> violation under this section respecting a violation of subchapter III of this
> chapter.*

42 U.S.C. § 6972(b)(2)(A) (emphasis supplied).

The plaintiff acknowledges that "it arguably did not comply with the 90 day notice provision specified in 42 U.S.C. § 6972." (Doc. 28 at 4). In fact, the plaintiff sent notice to the defendants, the EPA and ADEM of its intention to file suit approximately one week before the action was commenced. (Doc. 28 at 4). It asserts, however, that it "did not give notice of its intention to file suit 90 days in advance because it believed that it was exempted from giving notice since it alleged that the contaminations in question constituted 'hazardous wastes.'" (Doc. 28 at 4). It points out that under § 6972(b)(2)(A), a RCRA action may be brought immediately and without notice when a violation of subchapter III (hazardous wastes) is alleged. (Doc. 28 at 4).

The defendants argue, however, that the plaintiff was bound to observe the notice requirements because a claim stemming from petroleum leakage is regulated under subchapter IX (which concerns the regulation of underground storage tanks) rather than subchapter III (which regulates hazardous waste management). (Doc. 27, citing *Agricultural Excess and Supply Ins. Co. v. A.B.D. Tank & Pump Co.*, 878 F. Supp. 1091 (N.D. Ill. 1995)). The *Agricultural* court found that, under the reasoning of several previous cases, petroleum leaking from underground storage tanks should be considered a solid waste subject to regulation under subchapter IX, rather than a hazardous waste subject to regulation under subchapter III. *Agricultural*, 878 F. Supp. at 1094-96. Although the *Agricultural* court found that the plaintiffs in that case could bring a civil enforcement action under § 6972(a), as it applies to both solid and hazardous wastes, it found that they were not entitled to take advantage of the exception to the 90-day notice requirement, as that exception only applies to violations of subchapter III, as

13

leaked petroleum from underground storage tanks is a solid waste, not a hazardous waste.

*Agricultural Excess*, 878 F. Supp. at 1097, 1101.

The reasoning of the *Agricultural* court was adopted by the court in *PaineWebber*

*Income Properties Three Ltd. Partnership By and Through Third Income Properties, Inc. v.*

*Mobil Oil Corp.*, 902 F. Supp. 1514, 1520 (M.D. Fla. 1995), which stated as follows:

> The court's holding in *Agricultural* is persuasive. The broad definition of "solid wastes" in *Zands* [ *v. Nelson*, 779 F. Supp. 1254 (S.D. Cal. 1991)], and in the C.F.R.'s make it plausible for petroleum to be seen as a "solid waste". Therefore, adopting the rationale in *Agricultural*, Plaintiff is not entitled to an exception under § 6972(b)(2)(A) for complying with the statutory notice required. The Supreme Court held that because the notification language is expressly incorporated in Section 6972(a), "it acts as a specific limitation on a citizen's right to bring suit." *Hallstrom v. Tillamook County*, 493 U.S. 20, 23, 110 S. Ct. 304, 307, 107 L. Ed. 2d 237 (1989), *reh'g denied*, 493 U.S. 1037, 110 S. Ct. 761, 107 L. Ed. 2d 777 (1990). Plaintiff argues that *Hallstrom* is not applicable because petroleum is a hazardous waste. However, since this Court agrees with previous determinations that petroleum is not a hazardous waste but a solid waste, *Hallstrom* is controlling. PaineWebber is required to give statutory notice. Compliance with notice requirements "are mandatory conditions precedent to commencing suit under RCRA citizens suit provisions; a district court may not disregard these requirements at its discretion." *Hallstrom*, 493 U.S. at 31, 110 S. Ct. at 311.

*PaineWebber*, 902 F. Supp. at 1520.

As the court agrees with the reasoning in *Agricultural* and *PaineWebber*, it finds that the

plaintiff is not excepted from the notice requirement of § 6972(b)(2)(A).[10] The plaintiff did not

---

[10]The plaintiff complains that the Eleventh Circuit has never relied upon *Agricultural* and that the court should instead apply *Dague v. City of Burlington*, 935 F.2d 1343, 1351 (2nd Cir. 1991), *reversed in part on other grounds*, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992), in which the court found that where a plaintiff combines subchapter III claims with non-subchapter III claims in a "hybrid complaint," all the claims will be deemed to fall under the exception to the notice requirement for subchapter III claims. *Dague*, 935 F.2d at 1351-52. That case, however, is distinguishable from this case in that it did not involve petroleum leakage from underground storage tanks, and the court there found that some of the claims were brought under subchapter III. Here, the court has found that contamination is solid waste not regulated by

14

comply with the notice requirement, so the defendants' motion for summary judgment is due to be granted with respect to its claim under RCRA.

The plaintiff argues that, even assuming that it is bound by the 90-day notice requirement of § 6972(b)(2)(A), that the defendants should be equitably barred from raising the notice requirement this late in the litigation, as they should have asserted such objections early in the litigation and therefore waived them through delay. (Doc. 28 at 8). The plaintiff cites no authority in support of this argument and the court is not persuaded by it.

The plaintiff also argues that the purposes of the notice requirement were fulfilled because (1) well before the 90-day period, the plaintiff sufficiently notified the defendants of the contamination at the Facility and its alleged contractual obligation to remediate the contamination, (2) it was unnecessary to notify ADEM, as it was fully aware of the situation, as is evidenced by its numerous letters regarding contamination at the Facility and its previous request that a remediation plan be developed, (3) although ADEM has been served with the Complaint, it has yet to indicate that it solely will be responsible for enforcing the defendants' alleged obligations to remediate the contamination at the Facility, (4) it was unnecessary to notify the EPA as it was already involved in the monitoring at the Facility, (5) although the EPA has been served with the Complaint, it has yet to indicate that it should solely be involved in resolving this matter and (6) by their silence, ADEM and the EPA have acquiesced to the use of this lawsuit to resolve the matter between the parties and, accordingly, the purpose of the 90-day notice provision has been satisfied.

The plaintiff cites no cases holding that the 90-day statutory notice is not necessary

---

subchapter III. The court is not inclined to apply *Dague* in this case.

where a party required to be notified already has knowledge of the conflict or contamination giving rise to the action.  Nor does the plaintiff cite any statutory exceptions based on such previous knowledge.  And the court declines the plaintiff's invitation to assign a certain meaning or intent to the silence of ADEM and the EPA.  The court is not persuaded that the plaintiff is exempt from giving notice on any of these bases.  The defendants are therefore due summary judgment on the plaintiff's claim under RCRA.

**2.     Breach of Contract and Indemnity Claims**

The plaintiff alleges that the defendants breached their obligations under the Agreement and the Reaffirmation to indemnify, defend and hold harmless the plaintiff in the event that the Facility was not in compliance with RCRA or other federal, state or local laws or ordinances relating to hazardous or solid wastes.  (Doc. 18 at 26).  It asks the court for relief in the form of past and future costs incurred by it as a result of remediating the contamination at the Facility, as well as its attorneys' fees and costs.  (Doc. 18 at 27).

The section of the Agreement titled "Conditions Precedent to Closing" contains the following language:

> There shall have been no Hazardous Substances or Solid Waste discovered to be currently present in, under or on the Property, or on any adjacent or nearby property if the contamination of the Property is likely or imminent; provided, however, that if Purchaser discovered any particular Hazardous Substances or Solid Waste contamination during the Study Period and did not elect to terminate this Agreement pursuant to Section 4, the Purchaser shall be deemed to have waived objection to the particular contamination so discovered by Purchaser.

(Doc. 18 at Ex. B, § 15(c)).  The Agreement also states as follows:

10.     <u>Warranties and Representations by Seller</u>.[11]  In addition to the

---

[11]Standard is the "Seller" under the Agreement.

conditions set forth elsewhere herein, Seller and Jack Allison, as the Seller's sole shareholder ("Allison"), jointly and severally represent and warrant to Purchaser[12] that the matters described on Attachment IV are true and correct as of the date hereof and shall be true and correct as of the date of the Closing, which representations and warranties shall, as to Seller, survive the Closing for a period of twenty-four (24) months, unless otherwise expressly provided herein, and as to Allison, shall survive Closing for a period of (i) twelve (12) months after Closing if such breach of representation or warranty by Allison is not a knowing breach of warranty or misrepresentation, or (ii) twenty-four (24) months after Closing as to any knowing breach of warranty or misrepresentation by Allison, subject, however, to the provisions of Paragraph 13 of Attachment IV hereto.  Seller and Allison acknowledge that Purchaser has relied and will rely on such representations and warranties in executing this Agreement and in closing the purchase of the Property pursuant to this Agreement, and Seller and Allison agree during the term of this Agreement to promptly notify Purchaser in writing of any material change affecting such representations and warranties.

(Doc. 18 at Ex. B, ¶ 10).  Attachment IV to the Agreement, which is titled "Warranties and

Representations," states as follows:

> Seller and Allison jointly and severally represent and warrant to Purchaser that the following matters are true and correct as of the date hereof and shall be true and correct as of the date of Closing, which representations and warranties shall survive the Closing for the period stated in Section 10 of the Agreement except as expressly provided otherwise below:
>
> * * *
>
> Seller agrees to indemnify, defend and hold harmless Purchaser from and against any and all claims, liabilities, actions, suits, fines, proceedings, enforcement actions, investigation costs, clean-up actions, damages, losses and expenses, including, without limitation, court costs and reasonable attorney's fees, resulting from any use or operation of the underground storage tanks or handling of Hazardous Substances of any kind on (or disposal from) the Property prior to Closing, whether or not Seller knew or did not know of such contamination as of the Effective Date or prior to Closing.  Notwithstanding anything to the contrary contained in this Agreement, this indemnity obligation of Seller shall survive Closing and shall not be limited to the twenty-four (24) month limitation on the representations and warranties set forth in this Agreement.

---

[12]Plaintiff is the "Purchaser" under the Agreement.

17

Notwithstanding anything elsewhere in this Agreement, Seller's and Allison's representations and warranties set forth in this paragraph 13 shall survive Closing for the longer of (i) twenty-four months after Closing, or (ii) any applicable statute of limitations period.

(Doc. 18 at Ex. B, Attachment IV). The Agreement also contains the following language:

15. Conditions to Closing. The following shall be conditions precedent to Purchaser's obligations under this Agreement:

* * *

(C) Hazardous Substances. There shall have been no Hazardous Substances or Solid Waste discovered to be currently present in, under or on the Property, or on any adjacent or nearby property if the contamination of the Property is likely or imminent; provided, however, that if Purchaser discovered any particular Hazardous Substances or Solid Waste contamination during the Study Period and did not elect to terminate this Agreement pursuant to Section 4, then Purchaser shall be deemed to have waived objection to the particular contamination so discovered by Purchaser.

(Doc. 18, Ex. B at 5).

The Reaffirmation states, in pertinent part, as follows:

Standard 3 in 1 Car Wash Systems, Inc., an Alabama corporation ("Seller") and Jack Allison ("Allison"), on this 18th day of July, 2000, hereby reaffirm and certify to Car Wash Headquarters of Alabama, L.L.C., a Delaware limited liability company ("Purchaser"), that each of the representations and warranties of the Seller and Allison contained in that certain Agreement of Purchase and Sale (the "Agreement"), dated effective as of May 13, 1999, between the Seller and Purchaser, are true and correct in all material respects as of the date hereof.

Accordingly, as of the date hereof, Seller represents and warrants to Purchaser as follows, which representations and warranties shall, as to Seller, survive the Closing for a period of twenty-four (24) months, unless otherwise expressly provided herein, and as to Allison, shall survive Closing for a period of (i) twelve (12) months after Closing if such breach of representation or warranty by Allison is not a knowing breach of warranty or misrepresentation, or (ii) twenty-four (24) months after Closing as to any knowing breach of warranty or misrepresentation by Allison, subject, however, to the provisions of paragraph 13 below. . . .

18

(Doc. 18 at Ex. I, p. 1).  The Reaffirmation also includes the following provisions in a paragraph

titled "Environmental Matters":

> Further, (i) except for liquid hydrocarbon contamination occurring approximately
> ten (10) years ago, and as disclosed on the Secondary Investigation Evaluation
> Report dated June 28, 2000, no Hazardous Substance, including, without
> limitation, asbestos and the group or organic compounds known as
> polychlorinated biphenyls, has been generated, treated, stored, or disposed of, or
> otherwise deposited in or located on, or released on or to the Property, including,
> without limitation, the surface and subsurface waters of the Property, except that
> Seller has stored and used on the Property gasoline, automotive oil, car wash
> cleaning detergents, waxes and supplies, but has handled, stored, used and
> disposed of same (off the premises of the Property) in compliance with all
> applicable laws and regulations. . .
>
>                                 ***
>
> Seller agrees to indemnify, defend and hold harmless Purchaser from and against
> any and all claims, liabilities, actions, suits, fines, proceedings, enforcement
> actions, investigation costs, clean-up actions, damages, losses and expenses,
> including, without limitation, court costs and reasonable attorney's fees,
> resulting from any use or operation of the underground storage tanks or handling
> of Hazardous Substances of any kind on (or disposal from) the Property prior to
> Closing, whether or not Seller knew or did not know of such contamination as of
> the Effective Date or prior to Closing.  Notwithstanding anything to the contrary
> contained herein, this indemnity obligation of Seller shall survive Closing and
> shall not be limited to the twenty-four (24) month limitation on the
> representations and warranties set forth herein or in the Agreement.
>
> Notwithstanding anything elsewhere herein or in the Agreement, Seller's and
> Allison's representations and warranties set forth in this paragraph 13 shall
> survive Closing for the longer of (i) twenty-four months after Closing, or (ii) any
> applicable statute of limitations period.

(Doc. 18. at Ex. I, p. 4).

      The plaintiff argues that it is due summary judgment on the breach of contract claim, not

only with respect to past costs of study, monitoring, remediation, well abandonment

and attorneys' fees and costs, but also with respect to future costs it incurs as a result of

remediation at the Facility. (Doc. 18 at 26-27).

The defendants argue that they are due summary judgment on the plaintiff's breach of contract and indemnification claims. They argue that the plaintiff proceeded on to the Closing, even though it knew that there was contamination at the Facility and that ADEM had refused to issue a NFA letter, but had instead required remediation of the contamination. (Doc. 21 at 14-15). The defendants thus argue that the plaintiff, "pursuant to the terms of the closing documents, effectively waived any right to state a claim against the defendants for any issue relating to contamination of perched groundwater in the underground storage tank holding pit." (Doc. 21 at 14). Also, the defendants argue that "the existence of the contaminated groundwater was referenced in the representations provided to [the plaintiff] both at the time the contract was executed and at the time of closing." (Doc. 21 at 14). The defendants assert that this disclosure "clearly manifests the intent of the parties that any claim arising from this pre-existing contamination would not be the subject of an indemnification claim." (Doc. 21 at 14).

The plaintiff counters that, although the parties all knew that before closing that ADEM would not be issuing a NFA letter with respect to the Facility, and even though it did not object to the contamination itself, there was no waiver of its right to be indemnified. (Doc. 26 at 4). The plaintiff acknowledges that it knew about the contamination before the closing, but proceeded to buy the Facility based on the assurances that it would be indemnified with respect to costs listed in the indemnification clause.

The court finds the defendants' arguments unconvincing. There is no clear statement in the agreement or the reaffirmation indicating that the parties' foreknowledge of contamination at the Facility would render the indemnification provisions ineffective. The court likewise can

20

discern no reason to consider extrinsic evidence to discern the parties' intent with respect to the

contract, as the relevant provisions are clear and unambiguous.  Under Alabama law,

> [i]t is well settled that the words of a contract are to be given their ordinary
> meaning and that the intention of the parties is to be derived, if possible, from
> the provisions of the contract itself.  *Food Serv. Distribs., Inc. v. Barber*, 429 So.
> 2d 1025, 1028 (Ala. 1983) (citing *Sisco v. Empiregas, Inc.*, 286 Ala. 72, 237 So.
> 2d 463 (1970)).  Where a contract, by its terms, is plain and free from ambiguity,
> there is no room for construction and the contract must be enforced as written.
> *Ex parte Conference America, Inc.*, 713 So. 2d 953, 956 (Ala. 1998); *Ex parte
> South Carolina Ins. Co.*, 683 So. 2d 987, 989 (Ala. 1996).  "[A] document is
> unambiguous if only one reasonable meaning emerges."  *Wayne J. Griffin Elec.,
> Inc. v. Dunn Constr. Co.*, 622 So. 2d 314, 317 (Ala. 1993).

*Austin Apparel, Inc. v. Bank of Prattville*, 2003 WL 393827, *6 (Ala. Civ. App. Feb. 21, 2003),

*cert. denied*, *Ex parte Austin Apparel, Inc.*, 2003 WL 21949732 (Aug. 15, 2003).  As the

extrinsic evidence of intent before the court apparently resolves no ambiguity in the contractual

provisions between the parties, the court declines to consider it.

The defendants also point out that the above-quoted paragraph titled "Environmental

Matters" in the Reaffirmation includes not only a reference to the disclosure of contamination at

the Facility, but also an indemnification provision regarding costs arising from contamination at

the Facility.  The defendants argue as follows:

> A reading of the warranty and representation sections of the Attachment IV to
> the Agreement and contained in the Reaffirmation clearly indicates an intent that
> the groundwater contamination in the underground storage tank pit was not to be
> the subject of indemnification proceedings between the parties.  Obviously, if the
> groundwater contamination of the underground storage tank pit was to be
> included as a subject of possible future indemnification along with any other
> environmental conditions that were not disclosed to Car Wash HQ, there would
> have been absolutely no reason to include in the disclosure a specific reference to
> the existence of the condition.

(Doc. 21 at 16).

21

The court is not convinced by this argument.  The indemnification provisions are not

necessarily limited by the preceding disclosure reference.  On the contrary, it appears to be more

likely that the indemnification provision merely specifies that the Seller will indemnify the

plaintiff for all such costs, whether it knew of the contamination (as with that contamination

disclosed in the paragraph) or did not know of it.  The defendants are not due summary

judgment on the indemnification claim on the basis of such an argument.

The plaintiff also argues that it is due summary judgment with respect to this claim,

arguing that it should receive damages due to the defendants' alleged breach of the

indemnification provisions.  In pertinent part, the indemnification provisions state that

> Seller agrees to indemnify, defend and hold harmless Purchaser from and against
> *any and all claims, liabilities, actions, suits, fines, proceedings, enforcement
> actions, investigation costs, clean-up actions, damages, losses and expenses,
> including, without limitation, court costs and reasonable attorney's fees,
> resulting from any use or operation of the underground storage tanks or
> handling of Hazardous Substances of any kind* on (or disposal from) the Property
> prior to Closing, whether or not Seller knew or did not know of such
> contamination as of the Effective Date or prior to closing.

(Doc. 18 , Ex. B at Attachment IV, Ex. I at ¶ 13) (emphasis supplied).  The plaintiff contends

that this provision requires that the defendants indemnify it for past costs of ADEM-required

remediation efforts.  Such past costs, which stem from activities required by ADEM, are clearly

within the scope of the indemnification provisions, given their plain language, and the plaintiff

is due summary judgment with respect to those costs.

The plaintiff also argues, however, that it is due summary judgment with respect to

future costs of remediation.  It is possible that the future costs of the ADEM-approved passive

mediation program would fall under the indemnification provisions, although it would take

22

some effort to resolve how far in the future such recovery should be permitted. But in its filings before the court, the plaintiff has proposed a more extensive program of active remediation than that required by ADEM.

The plaintiff's president, Joseph William Kaplan ("Kaplan"), testified that this current groundwater monitoring plan approved by ADEM is "a passive and necessarily long-term remediation plan that, in fact, could last indefinitely. To date, although ADEM has for the time being accepted [the plaintiff's] semi-annual groundwater monitoring plan, ADEM has given no indication that it will issue a NFA in the future or allow continued passive remediation." (Kaplan Aff. at ¶ 13). Kaplan also testified that the "Defendants have failed and refused to pay for the monitoring or the eventual remediation or to provide any assurances, financial or otherwise, that they will help or assist with monitoring efforts in the future." (Kaplan Aff. at ¶ 13). Kaplan also stated as follows:

> Since [the plaintiff] has been given no indication that semi-annual groundwater monitoring will result in the issuance of a NFA, and since Defendants have failed to assist in such efforts or provide assurances that they will assist in such efforts in the future, Car Wash HQ has also taken steps to investigate the use of a chemical oxidation process to clean up the contamination at the Facility. Chemical oxidation is an active remediation measure intended to actually clean up the contamination at the Facility to "drinking water standards." ADEM requires the Facility to satisfy such standards before they will issue a NFA. [The plaintiff] has hired a consultant, URS Corporation, which has prepared a proposal for site remediation using the chemical oxidation process. A true and accurate copy of URS's report sent to my company is attached as Exhibit "2" hereto. I have provided information to Defendants regarding the chemical oxidation process but they have failed to respond to my correspondence. . . . The most reasonable approach to the contamination at the site which is in the best interests of human health and the environment is to employ this active remediation plan under the present circumstances because (1) this process will actually clean up the contamination, (2) this process will address the problem immediately, and (3) since the Defendants have failed and refused to provide any assurances whatsoever that, in accordance with their legal and contractual duties,

23

> they will pay for or assist with the potentially indefinite monitoring efforts,
> chemical oxidation is the most time and cost efficient method available to ensure
> that Defendants fulfill their financial obligations to pay for the cleanup.

(Kaplan Aff. at ¶ 14).[13]  The more extensive program would serve as a preemptive measure that

would resolve the contamination in its entirety, in case ADEM someday increases the

remediation requirements with respect to the contamination at the Facility.  The plaintiff argues

that an immediate and complete resolution is required, in view of the alleged recalcitrance of the

defendants to indemnify it for costs incurred up to the present time.

It is not clear that the more extensive program would be within the indemnification

provision; the items listed in that provision are of a compulsory nature, by far and large.

Although the meaning of the term "clean-up actions" for which the provision demands

---

[13]In its arguments regarding injunctive relief under RCRA, the plaintiff also states as
follows:

> At the present time, Plaintiff is merely performing groundwater monitoring at the
> Facility, which, eventually, may allow the environment to naturally attenuate the
> contamination.  This is, however, a passive and necessarily long-term remediation
> plan that, in fact, could last indefinitely.  While, to date, ADEM has for the time
> being accepted Plaintiff's semi-annual groundwater monitoring plan, ADEM has
> given no indication that it will issue a NFA in the future or will allow continued
> passive remediation.  Rather, it is quite possible that ADEM will require a costly
> risk based assessment to be undertaken and/or ADEM will require that a [sic]
> active remediation measure - - such as chemical oxidation or vacuum extraction
> - - be performed.  Even after such actions are taken, there is still no guarantee that
> ADEM will issue a NFA.  Therefore, once again, since Defendants have yet to
> assist in the remediation efforts in any way whatsoever and since the Defendants
> have failed to offer any assurances, financial or otherwise, that they will pay or
> take part in such remediation measures, the only reasonable solution to the present
> problem is for this Court to issue an injunction which requires the Defendants to
> immediately develop and employ an active remediation plan so as to protect the
> environment and human health from the contamination at the Facility.

(Doc. 18 at 25-26).

indemnification is not entirely clear when viewed in isolation, if it is viewed in the context of the other compulsory items in the provision – "claims, liabilities, actions, suits, fines proceedings, enforcement actions, investigation costs, clean-up actions, damages, losses and expenses, including, without limitation, court costs and reasonable attorney's fees," it appears that the phrase "clean-up actions" means those that are required or compulsory under threat of legal penalty. According to the familiar principle of noscitur a sociis, "where general and specific words which are capable of an analogous meaning are associated one with the other, they take color from each other, so that the general words are restricted to a sense analogous to that of the less general." *Winner v. Marion County Comm'n*, 415 So. 2d 1061, 1064 (Ala. 1982). The court therefore finds that any future costs of remediating the contamination, insofar as they arise from preemptive remediation measures not required by law, are not within the scope of the indemnification provision. Thus, the plaintiff's motion for summary judgment is due to be denied and the defendants' motion for summary judgment is due to be granted with respect to the plaintiff's claim for future costs related to preemptive remediation measures not required by ADEM. Both motions for summary judgment are due to be denied with respect to future costs related to remediation measures currently required by ADEM. Even assuming that such future costs are recoverable under the indemnification provisions, there is still a genuine issue of material fact with respect to how far into the future such damages should be permitted.

The defendants next argue that, even assuming that the plaintiff has some rights under the indemnification provisions, it was only Standard that made any agreement to indemnify, so Allison has no obligations under any such provisions. The plaintiff argues that the indemnification provisions are encompassed by the representations and warranties, including

25

those regarding the Facility's compliance with environmental laws, which were made by both defendants. "Logically," the plaintiff argues, "these individual representations concerning the environment go hand in hand with the indemnity obligation for noncompliance of the environment."

The court is not persuaded by the plaintiff's argument in this regard. The plain language of the indemnity provisions states only that "the Seller" agrees to indemnify the plaintiff. According to the documents, the "Seller" is Standard. The court will not extrapolate from the surrounding language to create an indemnity obligation for Allison, where it is not clear he agreed to undertake such an obligation. *See City of Montgomery v. JYD Int'l, Inc.*, 534 So. 2d 592, 594 (Ala. 1988) ("Agreements by which one party agrees to indemnify another for the consequences of the other's acts or omissions are carefully scrutinized," and such an agreement "is enforceable only if the indemnity provisions are unambiguous and unequivocal."). The defendants are due summary judgment on their claim that Allison has no obligation under the indemnification provisions. To the extent that Allison is liable for erroneous information set forth in the warranties and representations he made to the plaintiff, that liability may be determined apart from the indemnification provisions.

### 3.    Fraudulent Deceit, Fraudulent Misrepresentation, and Suppression Claims

In a claim for fraudulent suppression, the plaintiff must show: (1) that the defendant had a duty to disclose a material fact; (2) that the defendant concealed or failed to disclose that fact; (3) that the concealment induced the plaintiff to act; and (4) that the defendant's actions resulted in harm to the plaintiff. *Bethel v. Thorn*, 757 So. 2d 1154 (Ala. 1999). Fraudulent misrepresentation requires proof: (1) that the defendant made a false representation; (2) of a

26

material existing fact; (3) on which the plaintiff reasonably relied; and (4) which proximately

caused damage to the plaintiff.  *Id.*  The cause of action for fraudulent deceit is set out in an

Alabama statutory provision which states as follows:

> (a) One who willfully deceives another with intent to induce him to alter his
> position to his injury or risk is liable for any damage which he thereby suffers.
>
> (b) A deceit within the meaning of this section is either:
>
> (1) The suggestion as a fact of that which is not true by one who does not believe
> it to be true;
>
> (2) The assertion as a fact of that which is not true by one who has no reasonable
> ground for believing it to be true;
>
> (3) The suppression of a fact by one who is bound to disclose it or who gives
> information of other facts which are likely to mislead for want of communication
> of that fact; or
>
> (4) A promise made without any intention of performing it.

ALA. CODE § 6-5-104.

### a.    Warranties and Representations

The defendants argue that they are due summary judgment with respect to each of the

plaintiff's fraud claims based upon warranties and representations they made in connection with

the sale of the Facility.  (Doc. 21 at 19).  These claims are contained in Counts VI, VII and VIII

of the Amended Complaint.  (Doc. 9 at ¶¶ 76-90).

In pertinent part, the amended complaint states the following allegations with respect to

the plaintiff's fraudulent misrepresentation claims:

> 77.    Defendants misrepresented to Plaintiff that they would indemnify
> Plaintiff for any and all claims or liabilities incurred by Plaintiff as a result of any
> environmental noncompliance.  Such misrepresentations concerned material
> facts central to Facility operations and to Plaintiff's decision to acquire the

27

Facility.

78.     Defendants' misrepresentations were made either willfully to deceive
Plaintiff or recklessly without knowledge, or by mistake and innocently.

79.     Plaintiff justifiably relied upon the misrepresentations made by
Defendants in acquiring the Facility.

80.     As a proximate consequence of the misrepresentations made by the
Defendants, Plaintiff suffered insofar as Plaintiff, upon the purchase of the
Facility from the Defendants, incurred the diminution in value of the site
resulting from the on-site Contamination, and Plaintiff incurred and must incur
the costs of remediating the Contamination.

(Doc. 9 at ¶¶ 77-80).

In pertinent part, the amended complaint states the following allegations with respect to

the plaintiff's fraudulent suppression claims:

82.     By failing to advise Plaintiff that they would refuse to indemnify Plaintiff
for any and all claims or liability incurred by Plaintiff as a result of any
environmental noncompliance, Defendants fraudulently suppressed material
facts that were central to Facility operations and to Plaintiff's decision to acquire
the Facility.

83.     Defendants were under a duty to communicate those material facts to
Plaintiff, given the circumstances of Defendants' special knowledge of those
facts, and the unavailability of that knowledge to Plaintiff.

84.     Defendants' fraudulent suppression of those material facts was gross,
oppressive, and malicious and was intended to and did induce Plaintiff to acquire
the Facility.

85.     As a proximate consequence of this withholding of information by the
Defendants, Plaintiff suffered insofar as Plaintiff, upon the purchase of the
Facility from the Defendants, incurred diminution in value of the Facility
resulting from the on-site Contamination, and Plaintiff incurred and must incur
the costs of remediating the Contamination.

(Doc. 9 at ¶¶ 82-85).

Furthermore, the plaintiff makes the following allegations regarding its claim for

fraudulent deceit:

> 87.    Defendants, at all relevant times, knew or should have known that Defendants had no intention of indemnifying Plaintiff of any and all claims or liabilities incurred by Plaintiff as a result of environmental noncompliance.

> 88.    By willfully and/or recklessly misrepresenting the material facts regarding whether the Defendants intended to indemnify Plaintiff of any and all claims or liabilities incurred by Plaintiff as a result of any environmental noncompliance and by concealing the true nature of those material facts so as to mislead and deceive, Defendants intended to and did induce Plaintiff to acquire the Facility.

> 89.    As a proximate result thereof, Plaintiff suffered insofar as Plaintiff, upon the purchase of the Facility from the Defendants, incurred diminution in value of the Facility resulting from the on-site Contamination, and Plaintiff incurred and must incur the costs of remediating the Contamination.

> 90.    Defendants' actions, therefore, constitute fraudulent deceit.

(Doc. 9 at ¶¶ 87-90).

The defendants argue that these claims are merely restatements of claims asserted elsewhere, and that the only actual fraud claim asserted by the plaintiff here is a claim for promissory fraud based upon the defendants' alleged intent, at the time the relevant documents were signed, not to honor the terms of the indemnification provisions.  (Doc. 22 at 19-20).  This argument is consistent with the plain language of the amended complaint paragraphs cited above.  The plaintiff's fraud claims, insofar as they are based upon the representations and warranties made by the defendants in connection with the sale of the Facility, are apparently based upon the defendants' alleged intent, at the time the representations and warranties were made, not to perform certain obligations in the future.

In discussion of the elements of promissory fraud, the Alabama Supreme Court stated as follows:

29

"The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.  *See Russellville Production Credit Ass'n v. Frost*, 484 So. 2d [1084,] 1085-87 [ (Ala. 1986) ].  Furthermore, '[t]he failure to perform a promised act is not in itself evidence of intent to deceive at the time a promise is made.  If it were, the mere breach of a contract would be tantamount to fraud.'  *Id.* at 1086 (citation omitted)."

*Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988).

The plaintiff has not made the requisite showing that the defendants had an intent to deceive at the time the alleged promise was made.  On the contrary, the defendants acknowledge the existence of an indemnification obligation, but they assert their understanding and belief that the provision does not require Standard to indemnify the plaintiff for liability stemming from the presence of a hazardous substance that was fully disclosed and fully known by all parties prior to closing.  (Doc. 21 at 20).  The defendants' continuing failure to indemnify the plaintiff for past remediation costs and its disagreement with the plaintiff as to the scope of the indemnification provisions do not demonstrate that they intended to deceive the plaintiff at the time the promise was made but rather that their subjective understanding of the provisions' coverage may have differed from that of the plaintiff.

Except for the fact that the defendants have not indemnified the plaintiff for its costs associated with the contamination, the plaintiff has not shown that there is a genuine issue of material fact with respect to the defendants' alleged intent to deceive.  *See Russellville Production Credit Ass'n v. Frost*, 484 So. 2d 1084, 1087 (Ala. 1986) ("Unless a plaintiff puts

forth some proof that there was something more than a failure to perform, something upon which a jury could infer that at the time the promise was made the defendant had no intention of performing, it is error to submit a fraud claim to the jury.")

As there is no evidence to support a claim of promissory fraud, other than the defendants' failure to indemnify the plaintiff for costs relating to the contamination and their subsequent dispute with the plaintiff over the scope of the indemnification provisions, the plaintiff is unable to prove the required elements of the claim. The defendants are therefore due summary judgment on the plaintiff's claims of fraud with respect to the representations and warranties set forth in the documents related to the sale of the Facility.

### b.     Composition of Product Supply Lines

The plaintiff claims that the defendants presented it with documentation that misrepresented that the product lines, or pipes, from the dispensers to each of the three on-site underground storage tanks were made of reinforced fiberglass, when they were actually made of steel, which is not in compliance with applicable regulations and guidelines. (Doc. 18 at 27). Consequently, the plaintiff argues, it had to repair the lines. (Doc. 18 at 27). It claims that it is due summary judgment with respect to its costs of repair, because such costs were a direct and proximate result of the defendants' misrepresentation, even if such misrepresentation was innocently made. (Doc. 18 at 27).

The defendants argue that there is no evidence that the plaintiff ever relied on any of its representations regarding composition of the product lines. (Doc. 27 at 7). They point out that the evidence reveals that Kaplan could not recall having seen, before closing, the "Notification of Underground Storage Tanks" form submitted by Standard to ADEM on December 30, 1991,

31

which document erroneously indicates that the piping was made of fiberglass.[14]  (Doc. 27 at 7;

Doc. 18 at Ex. E; *see also* Doc. 18, Ex. S at p. CW00580).  In his deposition, Kaplan admits

that he is unable to say whether he had such a document before the closing or even whether the

parties had discussed it before the closing, although he said that it is possible that such

discussions may have occurred between Allison and one of his employees.  (Kaplan depo. at

77-79).

The plaintiff counters, however, that in the Reaffirmation, the defendants made another

erroneous representation in connection with the supply line composition, to wit:

> the underground gasoline storage tanks connected to the existing above-ground
> retail gasoline dispensing facilities on the Property, which underground gasoline
> storage *and dispensing facilities* Seller represents: (a) are in compliance with all
> current standards and specifications for newly installed underground gasoline
> storage tanks under applicable law, (b) have been tested for tank tightness and
> not found to be leaking, and (c) have not, except as set forth above, resulted in
> overspill or overfill contamination of the Property with petroleum products.

(Doc. 18,  Ex. I at ¶ 13) (emphasis supplied).  The plaintiff argues that the product lines are

"dispensing facilities."  (Doc. 26 at 6-7).  Thus, the plaintiff argues, the defendants'

representation that the dispensing facilities complied with current standards was untrue, insofar

as it referred to the supply lines, because the supply lines did not comply with applicable

standards.  (Doc. 26 at 6-7).  The plaintiff asserts that it is due summary judgment on this claim.

The court is inclined to agree that the term "dispensing facilities" includes the product

lines between the tanks and the gasoline dispensers, as such equipment is necessary if gasoline

---

[14]Because page 75 is omitted from the excerpts of Kaplan's deposition in the record, there
is no clear statement that the document he is referring to is the "Notification of Underground
Storage Tanks," but this can be deduced from the signature date mentioned as well as the fact
that the document is noted by Kaplan as being marked as "Exhibit 10."  (*See* Doc. 18 at Ex. E).

is to be dispensed from the tanks to those who would purchase it.[15] (*See also* Doc. 18, Ex. A at Ex. 4). And there appears to be no dispute that the product lines were not in compliance with applicable standards. So the first element of a fraudulent misrepresentation claim, that there be a false representation, is satisfied with respect to Standard, since the "Seller" made the pertinent false representation. The next determinations are whether the misrepresentation concerned a "material existing fact" and was "reasonably relied" upon by the plaintiff. "A 'material fact' is a fact that will induce action or inaction by the other party." *Ex parte Dial Kennels of Alabama, Inc.*, 771 So. 2d 419, 421 (Ala. 1999). The presence of the misrepresentation among the Reaffirmation's warranties and representations indicates that the facts of the misrepresentation probably were of significance to the parties and likely impacted the bargain between them. It also indicates that the plaintiff probably relied upon the subject facts of the representation. Assuming that to be the case, the plaintiff could show that the misrepresentation proximately caused the damages it complains of – its costs in replacing the line and losing product sales during the replacement process. Although the plaintiff clearly states a fraudulent misrepresentation claim adequate to withstand the defendants' motion for summary judgment with respect to the product-line representation in the Reaffirmation, the court cannot find that the plaintiff is so clearly due to prevail that there is no genuine issue of material fact remaining as to the claim. Both motions for summary judgment are therefore due to be denied as to this claim.

---

[15]It is well settled that the words of a contract are to be given their ordinary meaning and that the intention of the parties is to be derived, if possible, from the provisions of the contract itself. *Food Serv. Distribs., Inc. v. Barber*, 429 So. 2d 1025, 1028 (Ala. 1983) (citing *Sisco v. Empiregas, Inc.*, 286 Ala. 72, 237 So. 2d 463 (1970)).

### 4.    Negligence Claim

To prove a prima facie claim of negligence in Alabama, "'a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff.'" *Kmart Corp. v. Bassett*, 769 So. 2d 282, 284 (Ala. 2000) (quoting *Lowe's Home Ctrs., Inc. v. Laxson*, 655 So. 2d 943, 945-46 (Ala. 1994).

The defendants seek summary judgment on this claim, arguing that they owed no legal duty to the plaintiff with respect to the contamination at the Facility because it occurred long before the plaintiff ever agreed to purchase the Facility. (Doc. 21 at 23). They also argue that, even if they did owe some sort of duty to the plaintiff in this regard, they fulfilled it by disclosing information about the contamination prior to and in conjunction with the sale of the Facility. (Doc. 21 at 23).

The threshold question in a negligence case is whether the defendant owed a duty to the complaining party. *Ledbetter v. United American Ins. Co.*, 624 So. 2d 1371 (Ala. 1993). "The trial court must determine whether a duty existed and, if so, the extent of that duty." *Id.* at 1373. "The ultimate test of the existence of a duty to use due care is found in the foreseeability that harm may result if care is not exercised." *Buchanan v. Merger Enterprises, Inc.*, 463 So. 2d 121, 126 (Ala. 1984), *superseded by statute on other grounds as stated in Jackson v. Azalea City Racing Club, Inc.*, 553 So. 2d 112 (Ala. 1989). "In addition to the key factor of foreseeability, this Court has recognized three related considerations in determining whether a duty exists: 'the nature of the defendants' activity; . . . the relationship between the parties; and . . . the type of injury or harm threatened.' *Morgan v. South Central Bell Telephone Co.*, 466

34

So. 2d 107, 114 (Ala. 1985) (citing W. Prosser, Selected Topics in the Law of Torts, at 655

(1984))." *Patrick v. Union State Bank*, 681 So. 2d 1364, 1369 (Ala. 1996).

The plaintiff argues that the defendants had a legal duty to prevent the disposal of solid

and liquid waste at the Facility, which duty they breached, thereby causing harm to the plaintiff.

But the plaintiff does not explain why a general duty not to contaminate one's own property

should translate into a specific duty of care with respect to a possible future buyer of the

property, in the event that it is one day sold. Although the harm of contamination to a potential

future owner of the property might arguably be foreseeable, the relationship between the parties

here was a contractual one wherein the plaintiff had ample opportunity to gather information

about the Facility and any possible contamination or other problems associated therewith.

Although it argues that the defendants did not disclose "the severity of the contamination at the

Facility to the Plaintiff in the Agreement," (doc. 26 at 8), the court notes that the sale was

closed many months after the Agreement was executed, in which time the plaintiffs had an

opportunity to fully investigate the property.

Given these considerations, the court is reluctant to find that the defendants owed the

plaintiff a legal duty of care to prevent contamination at the Facility long before there was an

agreement between the parties to sell the Facility. Because the plaintiff lacks a necessary

element of its prima facie case of negligence, the defendants are due summary judgment on this

claim.

### 5.    Nuisance Claim

The plaintiff argues that the contamination of the subject property is a public nuisance

and that, by incurring the costs of remediation, it has sustained injuries different from those

35

sustained by the general public.

"A public nuisance is one which damages all persons who come within the sphere of its

operation, though it may vary in its effects on individuals." *Russell Corp. v. Sullivan*, 790 So.

2d 940, 951 (Ala. 2001), citing Ala. Code 1975, § 6-5-121; *Hunter-Benn Co. v. Nelson*, 267

Ala. 472, 103 So. 2d 783 (1958).  The *Russell* court stated as follows:

> "A private nuisance gives a right of action to the person injured" while "a public
> nuisance gives no right of action to any individual, but must be abated by a
> process instituted in the name of the state." Ala. Code 1975, § 6-5-121.
> However, an individual may have a cause of action under a public-nuisance
> theory if that individual suffered a "special damage . . . in which the public does
> not participate." Ala. Code 1975, § 6-5-123.  In order to support an individual's
> cause of action for a public nuisance, the nuisance must cause a "special
> damage" that is different in "kind and degree from [the damage] suffered by the
> public in general." *City of Birmingham v. City of Fairfield*, 375 So. 2d 438, 441
> (Ala. 1979); Ala. Code 1975 § 6-5-123.

*Russell Corp.,* 790 So. 2d at 951.

The defendants argue that the evidence reflects that the contamination does not

constitute a public nuisance. (Doc. 21 at 24).  Specifically, they argue that there is no evidence

that the contamination has migrated into the soil or groundwater outside the property of the

Facility or that it has caused damage to any adjacent landowner or third party.  Furthermore, the

defendants argue, even if the evidence showed that the contamination was a public nuisance, the

plaintiff could not recover on that theory because they knew of the contamination before they

ever bought the Facility.

The plaintiff counters that "the Defendants' operation of the Facility has impaired the

common right of the general public to the use and enjoyment of uncontaminated soil and

groundwater and thus presents a public nuisance." (Doc. 26 at 8).  This is not adequate

36

evidence that the contamination "damages all persons who come within the sphere of its operation," so as to create a public nuisance, however.  There is no evidence that all members of the general public who have contact with the Facility will suffer damage as a result of the contamination.[16]  The defendants are therefore due summary judgment on the nuisance claim.

## CONCLUSION

For the reasons set forth above, the court finds that the defendants' motion for summary judgment (doc. 20) is due to be granted in part and denied in part and that the plaintiff's motion for summary judgment (doc. 18) is due to be granted in part and denied in part.[17]

**DONE**, this _____ day of December, 2003.

_____
**JOHN E. OTT**
United States Magistrate Judge

---

[16]The court also notes that the plaintiff's knowledge of the contamination before it purchased the Facility would likely give the defendants an equitable defense to the nuisance claim.

[17]There appear to be a few claims asserted in the Amended Complaint that are not specifically addressed by the defendants' motion for summary judgment, including a fraudulent conveyance claim with respect to Rain Tunnell (Counts XIII) and a conspiracy claim (Count XIV).